**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| **PAUL QUINN COLLEGE,**<br><br>                    **Plaintiff,**<br><br>     **v.**<br><br>**THE SOUTHERN ASSOCIATION OF COLLEGES AND SCHOOLS COMMISSION ON COLLEGES, INC.,**<br><br>                    **Defendant.** | **1:09-cv-2327-WSD** |

## OPINION AND ORDER

This matter is before the Court on Defendant The Southern Association of Colleges and Schools Commission on Colleges Inc.'s ("SACS" or "Defendant") Motion for Summary Judgment [43].

I.     **BACKGROUND**

A.     <u>Procedural History</u>

On August 25, 2009, Paul Quinn College ("Paul Quinn," "the College," or "Plaintiff") filed this action against Defendant.  Plaintiff claims that the Defendant violated the College's common law due process rights and the Higher Education Act ("HEA") when SACS withdrew its accreditation on August 24, 2009.  This Court entered a temporary restraining order requiring SACS to restore Plaintiff's

accreditation pending the outcome of these proceedings.  On September 22, 2009,

SACS answered the Complaint, denying the claims asserted by the College.  On

December 7, 2009, Paul Quinn filed its Amended Complaint, adding claims for

breach of contract (Count III), tortious interference with contracts (Counts IV and

V), and tortious interference with prospective business relationships (Count VI).

On December 22, 2009, SACS filed is Answer to the Amended Complaint.  On

June 1, 2010, Defendant filed its Motion for Summary Judgment on the claims in

the Amended Complaint.  Paul Quinn opposes the motion.

     B.    <u>Facts</u>

SACS is a non-profit membership corporation incorporated under the laws

of Georgia.  Its membership is composed of public and non-public schools in

eleven (11) southern states, including Texas.  SACS operates, in part, through the

Commission on Colleges ("Commission").  The Commission is recognized by the

United States Department of Education as the regional body for accreditation of

higher education in the states in which SACS' member schools operate.  SACS'

accreditation decisions are important to colleges and universities ("institutions")

because, among other things, accreditation by SACS allows the institutions'

students to receive federally-backed financial aid under Title IV of the Higher

Education Act of 1965 ("HEA").

For accreditation, SACS requires its members to comply with the *Principles of Accreditation: Foundation for Quality Enhancement* ("Principles"). The Principles set forth several "Core Requirements" ("CR") and "Comprehensive Standards" ("CS"). In making accreditation decisions, SACS evaluates an institution's compliance with the Principles. After initial accreditation, an institution's accreditation is reaffirmed after five (5) years and every ten (10) years thereafter, if the institution does not encounter significant problems. If the Commission is made aware of and finds that an institution is not in compliance with the Principles, the Commission can place the institution on probation. While on probation, the institution is in a "monitoring period" during which a "Special Committee" of SACS reviews the institution's progress toward complying with the Principles. At the end of the monitoring period, an institution must submit a "Monitoring Report," which evaluates its compliance with the Principles and what action it has taken to address the deficiencies with the Principles that SACS identified to the institution. If the institution has not, at the end of its monitoring period, remedied the deficiencies identified by SACS, its accreditation must be removed unless the institution demonstrates and SACS finds "good cause" that the institution should not be removed from SACS' membership.

Paul Quinn is a private, four-year church affiliated, historically black college in Dallas, Texas. Paul Quinn became a member of SACS in 1972, and its accreditation was most recently affirmed in 1997. Paul Quinn's 2007 accreditation evaluation forms the basis of this suit. SACS ultimately determined that Paul Quinn was not in compliance with the Principles and the College's accreditation was not renewed.

1.  Paul Quinn's Accreditation Process

Paul Quinn began, in May 2006, the process for renewing its accreditation. At that time, and as is customary, SACS assigned a salaried member of its staff to serve as a liaison between the Commission and Paul Quinn. SACS appointed its Vice President, Dr. Lord, as the liaison for Paul Quinn's review. In October 2006, Dr. Lord and an accreditation review team convened by SACS visited the College and issued its report concluding that Paul Quinn failed to comply with twenty-one of the Principles. On July 6, 2007, SACS refused to renew Paul Quinn's accreditation and placed Paul Quinn on probation for twelve months.

In June 2008, the Commission extended Paul Quinn's probation for another twelve months. Dr. Lord and the Special Committee again visited the College and prepared a report on its findings. The Special Committee report indicated that Paul Quinn still was not in compliance with the Principles. SACS admits that Dr. Lord

edited and revised the Special Committee's report and admits that SACS' rules prohibit SACS personnel from participating in Commission and Special Committee decisions. SACS disputes, however that Dr. Lord violated SACS' rules by editing and revising the Special Committee report and that Dr. Lord influenced the Commission's final decision regarding the College's compliance with the Principles.

At the end of the extended probationary period, the Commission determined that Paul Quinn did not comply with three Principles: (1) CR 2.11.1 (Financial Resources); (2) CS 3.10.1 (Financial Stability); (3) and CS 3.3.1 (Institutional Effectiveness). According to SACS' procedures, failure to meet any one of these three provisions justifies removal of the College from membership in SACS, and SACS ultimately removed Paul Quinn from its membership. The Court discusses below SACS' findings regarding Paul Quinn's financial resources, financial stability, and institutional effectiveness.

2.     Financial Resources and Financial Stability

SACS concluded that Paul Quinn did not comply with CR 2.11.1 and CS 3.10.1, both of which relate to finances. SACS specifically concluded that Paul Quinn's financial situation deteriorated during the probation process and that accreditation should be denied to College. SACS found that the College's net

worth dropped from 2007 to 2008, its total assets dropped from 2007 to 2008, operational expenses exceeded revenues in both 2006 and 2008, and total liabilities increased from 2007 to 2008.

Compounding Paul Quinn's financial difficulties, in June 2009, the Department of Education advised the College, by letter, that Paul Quinn had failed to meet certain federal financial standards. The Department of Education required Paul Quinn to provide an irrevocable letter of credit for $465,000 to continue to participate in Title IV programs. After learning of the letter, SACS expressed concern regarding how the College would respond to the Department of Education and whether Paul Quinn had the ability to provide the letter of credit required by the Department of Education.

Paul Quinn and SACS largely agree on the College's financial situation before 2009, but the parties' dispute the significance and implications of Paul Quinn's 2009 financial data. In May 2009, in an effort to improve its financial condition, Paul Quinn settled an outstanding debt owed to Sodexco, one of its vendors ("the Sodexco Settlement"). The Sodexco Settlement reduced the debt owed to Sodexco from $981,000 to $300,000, provided Paul Quinn paid the $300,000 before August 2009. If the payment deadline was not met, the College was obligated to pay Sodexco the full $981,000 accrued. The parties disagree

whether the benefit of the Sodexco Settlement could be recognized before August 2009, before that payment was made.[1]  This dispute led to materially different views of Paul Quinn's 2009 financial situation.  If the Sodexco Settlement was recognized before August 2009, Paul Quinn's 2009 finances improved from previous years.  If the benefit of the Sodexco Settlement was not recognized for 2009, Paul Quinn's 2009 finances were not materially different from its 2007-2008 finances.  SACS also claims it was not obligated to consider Paul Quinn's 2009 financial data because they had not been audited and were subject to revision when SACS conducted its review.

### 3.    Institutional Effectiveness

During the period of Paul Quinn's accreditation and its subsequent extended probation period, SACS published three different versions of its Principles: (1) the 2002 edition, effective from 2002 to 2006 ("2002 Principles"); (2) an interim version, effective in 2007 ("Interim Principles");[2] and (3) the current version, which became effective on January 1, 2008 ("2008 Principles").  Each version of the Principles contained requirements relating to "Institutional Effectiveness," which specifically was spelled out in CS 3.3.1 and "Educational Programs," which

---

[1] The parties acknowledge the $300,000 payment was made in August 2009.

[2] The parties agree that SACS gave the College notice of the proposed revisions, and an opportunity to comment and vote on their adoption.

was spelled out in CS 3.4.1.  The language for both CS 3.3.1 and CS 3.4.1 changed

with each different version of the Principles, as shown in the table below.

| | CS 3.3.1<br>Institutional Effectiveness | CS 3.4.1<br>Educational Programs |
|---|---|---|
| 2002 Principles | The institution identifies expected outcomes for its educational programs and its administrative and educational support services; assesses whether it achieves these outcomes; and provides evidence of improvement based on analysis of those results. | The institution demonstrates that each education program for which academic credit is awarded (a) is approved by the faculty and the administration, and (b) establishes and evaluates program and *learning outcomes*. |
| Interim Principles | The institution identifies expected outcomes for its educational programs (including *student learning outcomes* for educational programs) and its administrative and educational support services, assesses whether it achieves these outcomes; and provides evidence of improvement based on analysis of those results. | The institution demonstrates that each educational program for which academic credit is awarded is approved by the faculty and the administration. |
| 2008 Principles | The institution identifies expected outcomes, assesses the extent to which it achieves these outcomes, and provides evidence of improvement based on analysis of the results in each of the following areas: [3.3.1.1] educational program, to include *student learning outcomes* . . . . | The institution demonstrates that each education program for which academic credit is awarded is approved by the faculty and the administration. |

In 2006, when Paul Quinn began the accreditation process and when Dr. Lord and the accreditation team visited, the 2002 Principles were in effect. In 2007, when the College was first placed on probation, the Interim Principles were in effect. Finally, when SACS ultimately determined that Paul Quinn was not in compliance and decided not to renew Paul Quinn's accreditation, the 2008 Principles were in effect.

The parties agree that SACS applied the three different versions of the Principles during Paul Quinn's accreditation process, but dispute the impact of the revisions. Paul Quinn believes that the 2002 Principles only required the College to assess learning outcomes at the program level, (i.e., majors and minors) – not at the individual student level. The College asserts that midway through its accreditation process it was required for the first time, under the Interim Principles, to assess "student learning outcomes." To support its position, Paul Quinn relies on the opinion of its expert, Dr. Dantzker.

SACS believes that the requirement to assess student learning outcomes has been a part of the Principles since 2002. SACS contends that CS 3.4.1 has, since 2002, required institutions to assess "learning outcomes." The Interim Principles simply moved the requirement to assess "learning outcomes" from CS 3.4.1 to CS 3.3.1 and restated the requirement as an obligation to assess "student learning

outcomes." As a result, SACS contends that any revisions were only cosmetic and the revisions did not result in any difference in how institutions were or are expected to measure learning outcomes and did not result in any changes to how institutions, including the College, were evaluated against these Principles.

## II.    DISCUSSION

### A.    Summary Judgment Standard

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56 (c). The party seeking summary judgment bears the burden of demonstrating the absence of a genuine dispute as to any material fact. Herzog v. Castle Rock Entm't, 193 F.3d 1241, 1246 (11th Cir. 1999). Once the moving party has met this burden, the non-movant must demonstrate that summary judgment is inappropriate by designating specific facts showing a genuine issue for trial. Graham v. State Farm Mut. Ins. Co., 193 F.3d 1274, 1282 (11th Cir. 1999). The non-moving party "need not present evidence in a form necessary for admission at trial; however, he may not merely rest on his pleadings." Id.

The Court must view all evidence in the light most favorable to the party opposing the motion and must resolve all reasonable doubts in the non-movant's favor. United of Omaha Life Ins. Co. v. Sun Life Ins. Co. of Am., 894 F.2d 1555, 1558 (11th Cir. 1990). "[C]redibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury . . . ." Graham, 193 F.3d at 1282. "If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial." Herzog, 193 F.3d at 1246. But, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party," summary judgment for the moving party is proper. Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

      B.     Common Law Due Process in the Accreditation Process

           1.     Overview of Common Law Due Process

Paul Quinn argues it was denied common law due process in SACS' decision to withdraw the College's accreditation. This Court and others have previously addressed whether common-law due process applies in an accreditation process. For example, in Hiwassee Coll. Inc. v. S. Ass'n of Colls. & Schs., 531 F.3d 1333 (11th Cir. 2008) ("Hiwassee"), Hiwassee College claimed SACS denied it common law due process in deciding to withdraw Hiwassee College's

accreditation.  Hiwassee College raised the fundamental question of whether

common law due process applies to accreditation decisions.  The Eleventh Circuit

found it unnecessary to decide whether accrediting agencies "have a common law

duty to employ fair procedures when making decisions affecting their members,"

id. at 1335, stating that even if SACS was required to provide common law due

process requirements in terminating Hiwassee's accreditation, Hiwassee had not

been denied common law due process in SACS' decision not to continue its

accreditation of the institution.  Id.  Aside from the Eleventh Circuit, cases from

both the Sixth Circuit and the Northern District of Georgia have previously held

that such a duty exists.  Thomas M. Cooley Law Sch. v. Am. Bar Ass'n, 459 F.3d

705 (6th Cir. 2006); Auburn Univ. v. S. Ass'n of Colls. & Schs., 489 F. Supp. 2d

1362 (N.D. Ga. 2002).

While the Eleventh Circuit in Hiwassee did not reach the question of

whether common law due process applies, it nonetheless provided a framework for

evaluating common law due process claims in the accreditation context.  The Court

held that an institution has an actionable claim for a due process violation if it can

show that "SACS's decision to terminate . . . from membership . . . was arbitrary

and capricious."  Hiwassee, 531 F.3d at 1335.  That is, judicial review of an

accreditation decision is limited to "only whether the decision of an accrediting

agency . . . is arbitrary and unreasonable or an abuse of discretion and whether the decision is based on substantial evidence." Id. at 1335 n.4. In evaluating a due process claim in an accreditation context, "great deference should be afforded the substantive rules of these [accrediting] bodies and courts should focus on whether an accrediting agency . . . followed a fair procedure in reaching its conclusions." Cooley, 459 F.3d at 713; St. Andrews Presbyterian Coll. v. S. Ass'n of Colls. & Schs., 679 F. Supp. 2d 1320, 1329 (N.D. Ga. 2009). That is, in reviewing accreditation decisions of accrediting agencies, courts "are not free to conduct a *de novo* review or substitute [their] judgment . . . Rather, in analyzing whether the [accrediting agency] abused its discretion or reached a decision that was arbitrary or unreasonable, we focus on whether the agency "conform[ed] its actions to fundamental principles of fairness." Cooley, 459 F.3d at 713.[3]

The College argues that SACS denied it common law due process claiming that (a) SACS failed to follow its own standards and procedures in removing Paul Quinn from membership because SACS' Vice President, Dr. Lord, participated in the review decision, (b) SACS' decision to remove Paul Quinn from membership

---

[3] The Court ultimately determines that it is not necessary to resolve whether common law due process applies in the accreditation process because there are not any disputed material facts to suggest that SACS violated any of the College's due process rights assuming such rights exist.

was not based on substantial evidence, and (c) SACS changed the test used to measure institutional effectiveness during Paul Quinn's accreditation process.

## 2. Dr. Lord's Participation

Paul Quinn asserts that there is a genuine issue of material fact whether SACS failed to follow its internal rules in revoking the College's membership. Specifically, Paul Quinn contends that according to SACS' policies and procedures, SACS staff members are not permitted to participate in final accreditation decisions and that Dr. Lord, SACS' Vice President, participated in the final decision by making revisions to the Special Committee's report with respect to CR 2.11.1 and CS 3.10.1, two of the three Principles SACS used to deny the College's accreditation bid. SACS argues that Paul Quinn misunderstands its regulations. SACS claims that Dr. Lord was expected to offer his suggestions on the report and that the suggestions did not impact or influence the Special Committee's decision-making process.

The evidence shows that Dr. Lord deleted a paragraph that attributed the College's financial difficulties to declining enrollment, which was the result of the College's rising admissions standards. The evidence also shows that Dr. Lord substituted a similar finding with a statement that Paul Quinn's finances do not indicate financial stability. The parties do not dispute that Dr. Lord made these

revisions, but disagree on the impact of these revisions. Paul Quinn argues that these revisions constitute "participation" in the Special Committee's decision. The College also argues, without support, that this "participation" was fundamental to the Commissions' decision to withdraw accreditation. SACS argues that these revisions were made in accordance with its policies and that Paul Quinn's argument that Dr. Lord's revisions were fundamental to the adverse accreditation decision is speculation.

SACS' standing rules regarding the relationship between the Commission and SACS' staff provide as follows:

> Staff members of the Commission on Colleges are **expected** to advise and inform the Commission and its committees on matters relative to an institution. They **should** offer advice or provide information at their own initiative or at the request of the Commission or its members. Such advice and information do not supplant the peer review process, but rather provide additional insight in reaching an informed decision. (emphasis added).

SACS contends that its policies required Dr. Lord to participate in the accreditation process and its interpretations of its own rules are entitled to deference. See Cooley, 459 F.3d at 714. SACS also asserts that the College has not presented any evidence showing that Dr. Lord's revisions resulted in a final determination that the College failed to comply with the Principles.

To support its position, SACS offered an affidavit from Dr. Myra Burnett, the Chair of the Special Committee that visited Paul Quinn during the accreditation process. Dr. Burnett stated that Dr. Lord's suggestions did not impact the Special Committee's decision-making process and that Dr. Lord did not influence the Special Committee's recommendation. The College has not offered any evidence to support its claim that Dr. Lord's actions were fundamental to the decision to remove Paul Quinn from SACS' membership or that SACS' ultimate decision was influenced by Dr. Lord's revisions. The Court finds that Paul Quinn has failed to show that the alleged rule violation caused it any injury or otherwise affected the accreditation process. See Hiwassee Coll., Inc. v. S. Ass'n of Colls. & Schs., 490 F. Supp. 2d 1348, 1351 (N.D. Ga. 2007) (rejecting institution's conflict of interest claim because college could not show that any conflict of interest caused its alleged injury); St. Andrews, 679 F. Supp. 2d at 1333.

### 3. Substantial Evidence

The College next contends that SACS' decision was not based on substantial evidence and, as a result, was arbitrary and unreasonable. Paul Quinn asserts SACS acted arbitrarily and capriciously in three respects. First, the College argues that SACS' treatment of the Sodexco Settlement was arbitrary and unreasonable because SACS, in its May 2009 evaluation, SACS refused to credit the benefit of

the Sodexco Settlement until Paul Quinn actually paid the $300,000 required by the settlement, which payment was made in August 2009 as the settlement required.  Paul Quinn argues that SACS has failed to assert any accounting principal preventing the College from accounting the debt relief as of the date the binding Sodexco Settlement agreement was reached.  The College offered the opinion of an independent auditor who found that it was proper to record the benefit of the Sodexco Settlement before August 2009.  SACS contends that because the Sodexco Settlement provided that the full $981,386 would be due if Paul Quinn failed to pay the agreed upon $300,000 before August 25, 2009, SACS was justified in its refusal to account for the settlement amount in its review of College's finances.  SACS also contends that its treatment of the settlement is a question of judgment and, even if its judgment was overly conservative, SACS' interpretation of the Sodexco Settlement was not arbitrary or capricious, or clearly erroneous.

Second, Paul Quinn contends that SACS failed to consider the College's 2009 financial data when concluding that it failed to satisfy CR 2.11.1 and CS 3.10.1.  Paul Quinn argues that it made the 2009 information available to SACS and that the 2009 information demonstrates that the College's financial condition was improving.  SACS agrees that Paul Quinn presented 2009 financial data, but

contends that the 2009 financial data was unaudited and subject to revision. SACS contends that CR 2.11.1 permits only consideration of audited financial statements, and because the 2009 financial data was unaudited, it was proper for SACS not to consider it. SACS also argues that the 2009 financial data only shows an improvement if the College could take advantage of the Sodexco Settlement prior to August 2009. Without the benefit of the Sodexco Settlement, the College's financial condition was not materially better than it was in 2007 and 2008.

Finally, Paul Quinn argues that SACS inappropriately held the Department of Education letter, which required the College obtain a letter of credit in order to receive federal funding, against Paul Quinn in evaluating its financial condition. Paul Quinn argues that because it later obtained the necessary letter of credit and continues to receive federal funding, SACS' reliance on the letter was arbitrary and unreasonable. SACS argues that its concern was not the fact that the Department of Education questioned Paul Quinn's financial stability, but rather how Paul Quinn was going to post a sufficient line of credit in order to continue to participate in Title IV programs. SACS contends that at the time of its decision, Paul Quinn did not have a plan to respond to the letter and obtain the necessary letter of credit. The fact that Paul Quinn was only able to secure the required line of credit in April 2010, nearly a year after the Department of Education issued its

finding, shows that Paul Quinn had either did not have a plan to obtain the letter or that the plan was deficient.

SACS' interpretations of its requirements related to financial stability and a sound financial base are entitled to deference. <u>Cooley</u>, 459 F.3d at 714. SACS has presented ample evidence supporting its decision that Paul Quinn had outstanding financial problems and shortcomings. The College's disagreement with SACS' ultimate findings and conclusions does not constitute a claim for a violation of common law due process, to the extent that such a claim exists. SACS monitored Paul Quinn and placed the College on probation for two years before ultimately deciding to remove Paul Quinn's accreditation. Paul Quinn fails to show that it was denied common law due process, or that SACS' decision to terminate the College's accreditation based on Paul Quinn's strained financial condition was arbitrary, unreasonable, and capricious. <u>Id.</u> at 713(stating that "[Courts are] not free to conduct a *de novo* review or substitute [their] judgment for that of the [accrediting agency]"). Indeed, that SACS used conservative accounting methods, required audited financial statements, and considered the College's difficulties in obtaining Title IV compliance shows that SACS was acting reasonably and not arbitrarily.

4.    Standards of Institutional Effectiveness

Paul Quinn alleges in this litigation that SACS significantly changed the way it measures "Institutional Effectiveness" after the reaffirmation process began in 2006, and that this change violated Plaintiff's due process rights. Compl. ¶¶ 87-94. SACS moves for summary judgment on this allegation on the grounds that the criteria on which Paul Quinn's institutional effectiveness was measured did not change, and there are not any disputed facts on this issue.

Plaintiff claims that the reaffirmation of its accreditation began in 2006 and when it did the 2002 Principles applied. Plaintiff claims further that the Interim 2007 Principles unfairly changed the "educational programs" required to be evaluated and for which improvement was required to be shown under CS 3.3.1. Plaintiff argues: "under the 2002 Principles, neither CS 3.3.1 nor CS 3.4.1 required an institution to demonstrate evidence of improvement with respect to student learning outcomes." Plff. Opp. at 7. Plaintiff further claims that under CS 3.4.1 of the 2002 Principles, Plaintiff was required only to demonstrate "that it establishes and evaluates learning outcomes," which Plaintiff argues means such outcomes were only required to be assessed "at the programmatic level (i.e., majors and minors) — not at the individual student level." Id. Plaintiff bases its argument on the absence of the term "student" is associated with the phrase

"learning outcomes" in the 2002 Principles, a word that was included in the 2007 Interim Principles, and in those later adopted in 2008. Id. at 7-9. The result, Plaintiff argues, is that SACS finding in 2009 that Plaintiff did not show improvement in its learning outcomes and thus failed to meet the requirements of CS 3.3.1, was based on a change to CS 3.3.1 as it existed under the 2002 Principles, which Plaintiff claims govern the whole of the reaffirmation process, which began in 2006. Plaintiff asserts that by applying a Principle different than the one that existed in 2006, its common law due process rights were violated. Plaintiff put it this way: "under the 2002 Principles, institutions were not required to 'demonstrate evidence of improvement' with respect to learning outcomes or "student' learning outcomes" and to have done so violated Plaintiffs due process rights. Id. at 24 (emphasis in original). Plaintiff broadly asserts: "prior to 2007, SACS had never required institutions to assess learning outcomes at the individual student level." Id. at 25 (emphasis in original). Plaintiff's argument is discredited by the express language of the 2002 Principles and the evidence in the record of this case.

The 2002 Principles set out the "Institutional Effectiveness" standards a school must meet. CS 3.3.1 of the 2002 Principles provides:

> The institution identifies expected outcomes for its educational
> programs and its administrative and educational support

services; assesses whether it achieves these outcomes; and provides evidence of improvement based on analysis of those results.

"Education Programs" is defined in CS 3.4.1 under the "Programs" section of the Principles. CS 3.4 defines "Education Programs" as "All Educational Programs" including "all on-campus, off-campus, and distance learning programs and course work." CS 3.4.1 imposes the following requirement on member institutions:

The institution demonstrates that each educational program for which academic credit is awarded (a) is approved by the faculty and the administration, and (b) establishes and evaluates program and learning outcomes.

Thus, the "educational programs" to which CS 3.3.1 and 3.4.1 applied, were, as defined in CS 3.4, all campus learning programs and course work, whether conducted on campus, off campus or by distance learning technologies and for which "academic credit" is given. C.S. 3.4 (emphasis added). Thus, CS 3.4.1 requires that the institution demonstrate for each of its "educational program" that the program is approved, that each program was properly established, and that its learning outcomes are evaluated.

CS 3.3.1 specifically requires an institution to (1) identify the "expected outcomes" for each "education program," (2) assess whether it achieves these outcomes, and (3) provide evidence of improvement based on analysis of the outcome assessment results.

By their terms, CS 3.3.1 and 3.4.1 apply to all "course work" for which "academic credit" is awarded. That is, the 2002 Principles, and CS 3.3.1 in particular, broadly apply to each component of the institution's curriculum including individual courses.

Plaintiff's argument is further discredited by the evidence in the record. SACS presented evidence in support of its Motion for Summary Judgment that, beginning in 2002, and from that year on, SACS evaluated learning outcomes for individual students and that the 2007 Interim and 2008 revised CS 3.3.1 simply restated in a single Principle what, in the 2002 Principles, was stated in CS 3.3.1 and 3.4.1. SACS notes the sworn testimony of its Rule 30(b)(6) representative that the application of CS 3.3.1 and what it required of institutions did not change from 2002 through 2008 and that there was no difference in the way learning outcomes were measured during this period. Deposition of Carol Luthman at 26-31.[4] SACS argues the undisputed evidence shows that from 2002 on, SACS has required its member institutions to establish learning outcomes for individual students, as well as education programs generally and that SACS consistently required institutions to evaluate the institution's performance with respect the institution's stated outcomes. Plaintiff offers what it argues is evidence disputing SACS claim that

---

[4] This evidence is consistent with the text of the 2002 Principles and what they required.

the evaluations standards and the application of them did not change after Plaintiff's reaffirmation began in 2006. Plaintiff claims specifically that there is a dispute regarding whether the learning outcomes required to be assessed changed from 2006 to 2008. The suggested evidence of a change is scant, and a review of it shows that it fails to raise an issue of fact. Each fact relied on by Plaintiff to show a dispute is addressed separately.

First, Plaintiff refers to the 2008 Special Committee Report to support its claim that the standard by which Plaintiff was evaluated changed after 2006. Plaintiff claims: "During its site visit, the 2008 Special Committee found that Paul Quinn _was_ in compliance with the first two prongs of the "learning outcomes" requirement," which Plaintiff argues were the "_only_ two prongs that existed when Paul Quinn began the process in 2006." Plff. Opp. at 10 (emphasis in original). A textual comparison of the 2002 Principles with the 2007 Interim and 2008 Principles shows that all three iterations of CS 3.3.1 had a three-prong requirement and Plaintiff's claim that the 2002 Principles had only two prongs and, specifically did not contain an "evidence of improvement" prong, is plainly incorrect. CS 3.3.1, in the 2002 Standards, required:

> 1.    Identification of expected outcomes for educational programs (and administrative and education support series;
>
> 2.    Assessment of whether the outcomes were achieved; and

3.    Evidence of improvement based upon analysis of
assessment done.

CS 3.3.1 by its terms, had three prongs that were required to be met.

Plaintiff next argues, relying on a the third of three declarations submitted by

its consultant Gail Dantzker, PhD. to support Plaintiff's summary judgment

opposition, that the terms of the 2002 Principles, when compared to the terms of

the 2007 Interim and 2008 Principles, supports that SACS did not, until after 2006,

require Plaintiff to assess performance of "student learning outcomes."  A careful

reading of Dr. Dantzker's declaration shows that she does not contest the facts

presented by SACS that it (i) did not change how CS 3.3.1 and 3.4.1 were applied

and (ii) that there was not any change in the application of CS 3.3.1 in 2007 or

2008.  Dr. Dantzker's opinion simply states her interpretation of the language

changes made to these principles in 2007 and 2008, and that the addition of the

word "student" before "learning outcomes" in 2007 by her interpretation

necessarily instituted a different standard and a different accreditation assessment.

She does not state any facts to show a change in the standard actually resulted in a

change in the evaluation conducted of Plaintiff's compliance with the standard.

She does not state any facts to support that CS 3.3.1 or CS 3.3.4 were applied

differently after 2006.  Dantzker's opinion is simply her perception of what the

changes meant and that perception is based on her reading of the text of the Principles. Her opinion is not based on any facts that the language changes resulted in a change in how Plaintiff or any other institution was evaluated with respect to the CS 3.3.1 or that the evaluation conducted change in any way from 2006 through 2008.

The affidavit submitted by Dr. Dantzker dated June 24, 2010, (the "June 2010 Affidavit") is principally relied on by Plaintiff to support her change in CS 3.3.1 application opinion. In paragraph three of the June 2010 Affidavit, Dantzker notes the three versions of the Principles of Accreditation published by SACS in 2002, 2007, and 2008. In the paragraphs that follow paragraph three, Dantzker interprets the changes based on the text of the Principles. Specifically, her interpretation of the standards is based only on what the Principles say, not on how they were or are applied. That she simply was interpreting the text of CS 3.3.1 and not expressing an opinion of how it was applied in Plaintiff's or any other institution's accreditation education is apparent in paragraph five of the June 2010 Affidavit. In paragraph five Dantzker states: "Under the plain language of the 2002 Principles, SACS required only assessment of learning outcomes at the programmatic level. Indeed, learning outcomes were measured under the heading 'Educational Programs' in Comprehensive Standard . . . 3.4.1 which stated:

'The institution demonstrates that each education program . . . establishes and evaluates program and learning outcomes.'"  June 2010 Aff. ¶ 5.  Continuing her comparison of the text of CS 3.3.1, Dantzker notes that starting in 2007 "student learning outcomes" were required, which she opines indicates that SACS moved from a "program based assessment to an individual student based assessment."  Id. ¶ 6.  She concludes her interpretation that this "change" in language indicated a change in evaluation criteria and that the change was a "major shift," one which she believed is more "time consuming and resource intensive."  Id. ¶ 8.  Dantzker, however, does not offer any facts to support her interpretation that the change in text in CS 3.3.1 resulted in the imposition of a new standard and does not state any facts to support her opinion that the "change" required more time or resources.

Dantzker also opines that in 2007, for the first time, SACS began "to require the school to 'demonstrate evidence of improvement' with respect to learning outcomes," which she observed was a "significant change from the 2002 Principles."  Id. ¶ 10.  This "additional requirement" she opines is "profound, especially considering that SACS simultaneously shifted to assessment at the individual student level."  Id.  This new approach, Dantzker repeats again, will take a burdensome amount of time.  Id. ¶ 11.

This opinion would be relevant and meaningful if the manner in which SACS conducted it evaluation was consistent with Dantzker's interpretation of what the Principles mean and whether the language change did, in fact, result in a different standard that was required to be met. The opinion simply does not dispute the facts offered by SACS that the standard did not change and that it was consistently applied since 2002. Dantzker's "interpretation" of the "plain language" of the Principles is not even consistent with the Principle's plain language. Dantzker's claim that the 2002 Principles applied only to the "program level" ignores the text of CS 3.3.1. She ignores in her affidavit and in each other declaration she has submitted in this case, that CS 3.3.1, including in 2002, defined "education programs" in terms of all programs—including all "course work" —for which "academic credit is awarded." The most fundamental unit for which academic credit is given by a university is a single college course—a fact known whether you are a college teacher, administrator, or student. For Dantzker to opine that "learning outcomes" does not include learning outcomes for students in classes for which they receive academic credit is not only illogical but it does practical and legal violence to the language of CS 3.3.1.

Second, the plain language of CS 3.3.1 in the 2002 Principles states a three, not a two, prong evaluation. CS 3.3.1 states: "The institution [1] identifies

expected outcomes for its education programs and it's administrative and education support services; [2] assesses whether it achieves these outcomes; and [3] provides evidence of improvement based on analysis of those results." This is precisely the three same prongs that appear in the 2007 Interim and 2008 Principles. To claim that in 2002 only two prongs applied ignores the requirements of CS 3.3.1 in the 2002 Principles and ignores the intent and text of the CS 3.3.1 which required a statement and ongoing evaluation of all learning outcomes—the outcome for the learning that is the core of the university—those for which academic credit is given to students.

There is a complete absence of interpretational or factual support for the late-advanced opinion offered by Dantzker. While Dantzker notes in the June 2010 Affidavit that it "supplements and clarifies the analysis [that she] provided in [her] Declaration, dated August 4, 2009; and Addendum to Declaration, dated March 20, 2010, there is nothing in either of these documents in which Dantzker addresses the requirement that in 2002 all programs for which academic credit is given was required to be addressed pursuant to CS 3.3.1 and she does not state any facts disputing SACS evidence that at all times since 2002, CS 3.3.1 contained a three-prong requirement that included specifically in all those years "evidence of

improvement based on analysis" of the learning outcomes achieved.[5]  Finally, and

most importantly, Dantzker does not ever investigate or provide any evidence of

how SACS at Plaintiff, or any other institution, actually evaluated them against the

CS 3.3.1 Standard during the period 2002 through 2008.  She simply fails to

provide any facts to show that the evaluation process changed at all after 2006 and,

on the record here, the only evidence before the Court is that no change was made

because no change was intended or enacted by implementation of the 2007 Interim

Standards and the Standards put into place in 2008.

The Court concludes that the undisputed facts here are that CS 3.3.1, as

applied to Plaintiff (or any other institution), did not change after 2006 as alleged

by Plaintiff in its Complaint.  Accordingly, Paul Quinn has not shown that SACS

denied it common law due process in the accreditation process, even if such a duty

exists.[6]

---

[5] The Court was not obligated to scour the August 4, 2009 Declaration or the
March 20, 2010 Addendum, although it did.  The Declaration and Addendum are
burdensome, continuing, and poorly organized presentations that provided little
factual support for any of the opinions offered by Dantzker, and do not contain any
factual support to show that there is a factual dispute about the alleged changes to
Principle 3.3.1.

[6] The Court need not answer the undecided question of whether common law due
process applies to accrediting institutions when making accreditation decisions.
SACS' procedures in the present case have met the requirements of common law
due process to the extent such due process requirements exist in the accreditation
process.

5. <u>Daubert Evaluation</u>

SACS also argues that Dr. Dantzker's opinion is not admissible under Federal Rule of Evidence 702 and does not meet the requirements of reliability set forth in <u>Daubert v. Merrell Dow Pharm., Inc.</u>, 509 U.S. 579 (1993) and <u>Kumho Tire Co.v. Carmichael</u>, 526 U.S. 137 (1999). While it is not necessary to determine the admissibility of Dr. Dantzker's opinion, because it does not raise any issues of fact, the Court also finds that the opinion Dr. Dantzker offers is not an opinion that is admissible under Rule 702.

Defendant seeks to exclude Dantzker's testimony on the grounds that (1) she is not qualified to render an expert opinion that CS 3.3.1 changed after 2006 and (2) that CS 3.3.1 was applied to impose accreditation standards different from the standard applied before 2006.

*i.* *The Standard on Expert Testimony*

Rule 702 of the Federal Rules of Evidence provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

To exercise properly its role as a gatekeeper to the admission of scientific testimony, the Court must consider whether (i) the expert is qualified to testify regarding the matters he intends to address, (ii) the expert's methodology is sufficiently reliable under Daubert, and (iii) the expert's testimony assists the trier of fact to understand the evidence or to determine a fact in issue. Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd., 326 F.3d 1333, 1340-41 (11th Cir. 2003).

Daubert sets forth a non-exclusive checklist for use in evaluating the reliability of scientific expert testimony. The factors include: (1) whether the expert's technique or theory can be or has been tested – that is, whether the expert's theory can be challenged in some objective sense, or whether it is instead simply a subjective, conclusory approach that cannot reasonably be assessed for reliability; (2) whether the technique or theory has been subject to peer review and publication; (3) the known or potential rate of error of the technique or theory when applied; (4) the existence and maintenance of standards and controls; and (5) whether the technique or theory has been generally accepted in the scientific community. Daubert, 509 U.S. at 593-94. The Court is not required to consider each of these factors, "and a federal court should consider any additional factors that may advance its Rule 702 analysis." Quiet Tech. DC-8, Inc., 326 F.3d at 1341.

The same criteria that are used to assess the reliability of a scientific opinion may be used to evaluate the reliability of non-scientific, experience-based testimony.  Kumho, 526 U.S. at 152.  "Sometimes the specific Daubert factors will aid in determining reliability; sometimes other questions may be more useful.  As a result, 'the trial judge must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable.'"  United States v. Frazier, 387 F.3d 1244, 1262 (11th Cir. 2004) (quoting Kumho, 526 U.S. at 152).

In applying the Daubert criteria and others that may be relevant, the Court must determine if the expert unjustifiably extrapolated from an accepted premise to an unfounded decision.  General Elec. Co. v. Joiner, 522 U.S. 136, 146 (1997).  That is, there must not be too "great an analytical gap between the data and the opinion proffered."  Id.  The Court must be assured the expert is using the "same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  Kumho, 526 U.S. at 152.  "[N]ot only must each stage of the expert's testimony be reliable, but each stage must be evaluated practically and flexibly without bright-line exclusionary (or inclusionary) rules."  Heller v. Shaw Indus., Inc., 167 F.3d 146, 155 (3d Cir. 1999).  The focus must be on the principles and methodology and not the conclusions reached.  Daubert, 509 U.S. at 595.

As the court noted early in this opinion, the Dantzker affidavits are confusing, burdensome and so poorly presented that they fail to meet the requirements of Rule 702 of the Federal Rule of Evidence that the opinion assist the trier of fact to understand the evidence or to determine an issue of fact. The opinion here fails to perform this fundamental function. Dantzker's June 2010 and other affidavits and declarations are so fundamentally ambiguous and devoid of factual or logical support for the "opinions" offered, they are not helpful and were not helpful to the Court in its consideration of the pending motion.

Dantzker also does not state, in any of the affidavits or declarations that were submitted in support of Plaintiff's opposition to the SACS summary judgment motion (or in the earlier proceedings in this matter) that she ever evaluated how SACS actually applied CS 3.3.1 or 3.4.1 here, in the past or in regards to any other institution. Dantzker has not provided any basis upon which she is qualified to state an opinion how SACS evaluated learning outcomes and whether it has in the past or currently not applied them to the establishment and assessment of learning outcomes from the student perspective. She has not presented any evaluation of the SACS interpretation and application of CS 3.3.1 or 3.4.1 — in which it could or has been peer-reviewed. She fails to offer any factual evidence as to the manner in which SACS generally or with respect to specific

institutions actually determines if an institution complies with the CS 3.3.1 and

3.4.1. Dr. Dantzker's opinion regarding Principles 3.3.1 and 3.4.1 and any claimed

changes in how they are applied is speculative and unfounded, and thus, not

admissible.

      C.    <u>Assuming Common Law Due Process Applies</u>

Even if common law due process applied here, the record does not show

there is any disputed evidence regarding SACS's decision to revoke the College's

accreditation and there is no dispute about what SACS used to reach this

conclusion. Based on the facts here, the Court necessarily would conclude, as a

matter of law, that SACS did not act arbitrarily and unreasonably, or abuse the

discretion granted to it as an accrediting agency, in not renewing the College's

accreditation. In short, the review procedure here was, as a matter of law, fair.

<u>Cooley</u>, 459 F.3d at 713; <u>Hiwassee</u>, 531 F.3d at 1334-35.

      D.    <u>Higher Education Act</u>

In Count II, Paul Quinn alleges that SACS violated the due process

requirement of the Higher Education Act of 1965, 20 U.S.C. § 1078 et seq.

("HEA"). SACS seeks summary judgment as to Count II, arguing that the

Eleventh Circuit has previously held that an institution has no private right of

action under the HEA. <u>Hiwassee Coll. v. S. Ass'n of Colls. & Schs.</u>, 531 F.3d

1333, 1335 (11th Cir. 2008) citing <u>McCulloch v. PNC Bank Inc.</u>, 298 F.3d 1217, 1224 (11th Cir. 2002).  Paul Quinn did not respond to SACS' position. Accordingly, the Court sees no reason to revisit this well-established precedent and grants summary judgment on Count II.

      E.     <u>Breach of Contract</u>

In Count III of its Amended Complaint, Paul Quinn alleges that SACS breached the membership contract between the College and SACS by removing the College from membership.  The parties agree that involuntary termination of membership in a non-profit corporation, such as SACS, is governed by O.C.G.A. § 14-3-621.  The parties also agree that a member who is involuntarily removed may only pursue a breach of contract claim if the procedures used in the removal were not "fair and reasonable under the circumstances . . . ."  <u>Rose v. Zurowski</u>, 511 S.E.2d 265, 268 (Ga. Ct. App. 1999).  Naturally, the parties dispute whether SACS' procedures to remove Paul Quinn were fair and reasonable.

The Court has already found that no question of material fact exists as to whether SACS made changes to the way it measures institutional effectiveness during the accreditation process, there is necessarily no question of fact as to whether SACS' procedures in removing Paul Quinn from its membership were fair and reasonable.  The Court also finds the process and procedures employed by

SACS in reviewing the College's accreditation were fair and reasonable.

Accordingly, SACS' motion is required to be granted with respect to Count III.

      F.    <u>Tortious Interference</u>

In Counts IV-VI of its Amended Complaint, Paul Quinn alleges that SACS

tortuously interfered with its contracts and business relations. Specifically, Paul

Quinn asserts that SACS withdrew its accreditation without basis and acted

purposefully and intended to injure Paul Quinn and, thereby tortuously interfered

with its enrollment contracts with current students (Count IV), its Title IV

eligibility contract with the Department of Education (Count V), and its future

business relations with current and prospective students (Count VI). SACS moved

for summary judgment on Counts IV-VI. Paul Quinn has not responded to these

issues and they are deemed to be unopposed. <u>See</u> L.R. 7.1(B), N.D.Ga. ("Failure to

file a response shall indicate there is no opposition to the motion.").

Under Georgia law, the claims of tortious interference with contractual

relations and business relations both require that there be some "improper action or

wrongful conduct by the defendant without privilege . . . ." <u>Witty v. McNeal</u>

<u>Agency, Inc.</u>, 521 S.E.2d 619, 628 (Ga. Ct. App. 1999). "Privilege" in this context

"means legitimate economic interests of the defendant or a legitimate relationship

of the defendant to the contract, so that [the defendant] is not considered a stranger,

interloper, or meddler." <u>Disaster Servs., Inc. v. ERC P'ship</u>, 492 S.E.2d 526, 529

(Ga. Ct. App. 1997).  When a "defendant has a bona fide economic interest in the

contact or **relationship with one of the parties to the contract**, he is not a

stranger to the contract and acts with privilege with regard to that contract.  <u>Fortson</u>

<u>v. Brown</u>, 690 S.E.2d 239, 241 (Ga. Ct. App. 2010) (emphasis added).  The fact

that a defendant did not sign a particular contract does not mean that the defendant

is not "a stranger to the contract itself or to the business relationship giving rise

thereto and underpinning [the contract]." <u>Disaster Servs., Inc.</u>, 492 S.E.2d at 529.

"[I]n order to be liable for tortious interference, one must be a stranger to both the

contract at issue and the business relationship giving rise to and underpinning the

contract." <u>Tidikis v. Network for Med. Commc'ns & Research, LLC</u>, 619 S.E.2d

481, 486 (Ga. Ct. App. 2005).

SACS contends that, as Paul Quinn's accreditor, it had a significant

relationship to the College such that it was neither a stranger to actual or potential

student enrollment contracts, whose financial aid in part depends on SACS

accreditation.  Similarly, SACS contends that it is not a stranger to the Department

of Education Title IV contract, which largely depends on SACS accreditation.

Because Paul Quinn has not offered any evidence to refute these assertions, the

Court accepts them as true.  Accordingly, as SACS was not a stranger to either the

relationship between Paul Quinn and its students or to the relationship between

Paul Quinn and the Department of Education, SACS is privileged.  Because SACS

is privileged, it cannot be liable for tortious interference and the Court grants

summary judgment with respect to Counts IV-VI.

## III.    CONCLUSION

For the foregoing reasons,

**IT IS HEREBY ORDERED** that SACS' motion for Summary Judgment

[43] is **GRANTED**.


**SO ORDERED** this 19th day of January, 2011.


_____
WILLIAM S. DUFFEY, JR.
UNITED STATES DISTRICT JUDGE